Matthew A. Pequignot, Bar No. 16062
Pequignot + Myers
90 North Coast Highway 101
Suite 315
Encinitas, CA 92024
Phone: 202-328-1200
Facsimile: 202-328-2219
mpequignot@pmiplaw.com

Attorney for Plaintiff Therapearl, LLC

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| THERAPEARL, LLC<br>8106 Stayton Drive, Suite B<br>Jessup, Maryland 20794<br>Howard County,<br><br>                    Plaintiff,<br><br>vs.<br><br>RAPID AID LTD<br>4120A Sladeview Crescent<br>Mississauga, Ontario L5L 5Z3<br>Canada,<br><br>                    Defendants. | Case No.<br><br>COMPLAINT<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff THERAPEARL, LLC (hereinafter "Therapearl"), by its attorney, for its Complaint against Defendant RAPID AID, LTD. (hereinafter "Rapid Aid"), alleges the following on information and belief:

## NATURE OF THE CASE

1.        This is a civil action seeking a declaratory judgment to clarify the rights of Therapearl with respect to its intellectual property marking and patent related publicity and/or advertising practices.

2.        This civil action is also seeking damages for Rapid Aid's violation of Section 2 of the Sherman Antitrust Act, damages for Rapid Aid's tortious interference with contract or business relationships, and damages for Rapid Aid's acts constituting unfair competition.

3.        This case arises from Rapid Aid's unlawful and/or anti-competitive acts which have caused harm to Therapearl's commerce within and affecting the United States, and which have called into question Therapearl's rights to lawfully mark or publicize with patent related information or markings.

## THE PARTIES

4.        Plaintiff, Therapearl, is a Limited Liability Company formed under the laws of the State of Maryland, which operates a principal place of business at 8106 Stayton Drive, Suite B, Jessup, MD 20794. Therapearl designs, manufactures, markets, and otherwise commercializes innovative hot/cold therapy products within the United States, Canada, the European Union, and other countries around the world.

5.        Defendant Rapid Aid Ltd. is a Federally Incorporated Company in Canada that has its principal place of business at 4120A Sladeview Crescent, Mississauga, Ontario L5L 5Z3. Rapid Aid is the self-described "number one manufacturer of hot/cold therapy products worldwide" and is, according to its own claims, "the largest private label manufacturer of hot/cold therapy products." Rapid Aid sells its hot/cold therapy products in drugstores throughout Canada and the United States,

including drugstores in the State of Maryland. As part of its commercial operations, Rapid Aid operates a business and/or distribution office at 250 Cooper Ave., Suite 102, Tonawanda, NY 14150.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §15, 28 U.S.C. §§ 1331, 1337, 1338, and the Declaratory Judgment Act, 28 U.S.C. § 2201. This Court also has subject matter jurisdiction over Therapearl's state law claims pursuant to the principles of pendant jurisdiction under 28 U.S.C. § 1367(a).

7.      This Court has personal jurisdiction over Rapid Aid because, *inter alia*, Rapid Aid transacts business in the State of Maryland, engages in a persistent course of conduct in the State of Maryland, expects or reasonably should expect its acts to have legal consequences in the State of Maryland, and because Rapid Aid's acts have caused harm and continue to cause harm to Therapearl in the State of Maryland.

8.      Venue exists in this District under 28 U.S.C. §1391(b) and (c).

## FACTUAL ALLEGATIONS

9.      Rapid Aid, according to its own website, is the "number one manufacturer of hot/cold therapy products worldwide. Rapid Aid is also, according its website, the "largest private label manufacturer of hot/cold therapy products." From its worldwide sales, Rapid Aid generates approximately 17.5 million dollars in revenue each year.

10.     Shoppers Drug Mart ("Shoppers") - Canada's leading drug store chain - is and has been a customer of Rapid Aid since at least as early as 1996 in connection with the purchase of hot and cold pack therapeutic products.

11.     Therapearl, which began with the innovation of a private physician, Dr. Carol Baltazar, is a new market entrant in the field of hot/cold therapy and a competitor to Rapid Aid.

12.     Dr. Baltazar - recognizing during her practice of medicine that hot/cold therapy products could be improved upon -  invented and began making an innovative new hot and cold therapeutic product for treatment of the human body. This medical and consumer products innovation led to the formation of Therapearl, which soon began successfully commercializing a ground breaking new line of hot/cold therapy products in competition with Rapid Aid.

13.     Providing benefits over products of the past, Therapearl's hot/cold therapy product line provides a wide variety and configuration of flexible packs, filled with soft, gel-like beads, which can be heated or cooled to provide hot or cold temperature therapy for therapeutically effective periods of time.

14.     In addition to addressing temperature therapy in novel ways, Therapearl's packs also exhibit unique appearances which leave a distinct impression in the minds of consumers, making the products desirable, even for their eye-catching appearance alone.

15.     Since their inception, the innovative nature and appearance of Therapearl's products has been recognized with the grant of a multitude of intellectual property rights – including patents and design registrations - around the world, including within the United States, Canada, the European Union, Australia, and Brazil.

16.     In addition to already granted intellectual property rights, Therapearl has numerous patent applications pending before the United States Patent Office for its hot/cold therapy product line. One of those applications was published on December 9, 2010 as United States Patent Application Publication No. US2010/0312317A1.  (Exhibit 1)

17.     In addition to pending applications covering its products, Therapearl has at least two United States patent applications pending which cover its unique packaging. These applications are currently protected by the United States Patent Office as secret in accordance with United States law.

18.     In view of the existence of Therapearl's pending patent applications, Therapearl sometimes includes the words "patent pending" printed directly on certain of its products as well on the packaging in which the products are sold.

19.     In addition to sometimes marking directly on its products and packaging, Therapearl "virtually marks" certain of its products in accordance with and as expressly permitted by 35 U.S.C. § 287(a). Since the implementation of amendments to § 287(a), signed into law with the America Invents Act on September 16, 2011, such so called "virtual marking" is specifically recognized as lawful and is indeed encouraged by the statute.

20.     A "virtual mark" is a printed web-link or "url" which, when accessed with a computer, directs an internet user to a website, which is accessible for free, and which provides information about Therapearl's intellectual property.

21.     Therapearl prepares and maintains a virtual marking page in the United States, on its principal website, which is hosted in the United States on servers located in the United States.

22.     Therapearl's virtual marking webpage, accessible at: http://www.therapearl.com/patent/, is visible to consumers and competitors in the United States, as well as to parties worldwide.

23.     As a result of the unique desirability and effectiveness of Therapearl's products, Therapearl has grown rapidly and was named to the 2013 *Inc. 500/5000* list for experiencing more

than 2000 percent growth in the past three years. Because of the distinctive appearance of Therapearl's products, they have made numerous appearances in movies and television shows.

24.     Therapearl's growth is attributable not only to its electronic or internet based stores which make its product available world-wide, but also to Therapearl's product availability in brick-and-mortar drug store chains in the United States and Canada. For example, Shoppers began carrying Therapearl's "branded" products (products which display "Therapearl" as the brand) on its shelves on or around December 2010.

25.     Pleased with the sales success and quality of Therapearl's branded products in Shoppers' network of retail stores, Shoppers entered into negotiations with Therapearl on or around July 2011 to add an additional "private label" line of Therapearl products which would be sold within Shoppers' network of drug stores. "Private label" products are products which would be made and supplied by Therapearl but which would bear a different brand.

26.     As a result of their negotiations, on or around March 2012, Therapearl and Shoppers reached an agreement whereby Therapearl would provide a "private label" line of products to Shoppers, for sale in Shoppers' stores ("the Private Label Contract").

27.     In order to fulfill the contract with Shoppers, Therapearl would export its "private label" line of hot/cold therapy products from its facilities in Jessup, Maryland to Shoppers in Canada, as it does with much of its "branded" product volume.

28.     Shoppers is a company with more than 1200 stores located in nine Canadian provinces, many of which share close geographic proximity to U.S. cities and therefore frequently have U.S. customers. For example, there are at least 4 Shoppers locations within 4 miles of the New

York/Canadian border; 10 locations within 10 miles of the Michigan/Canadian border; and 7 locations within 10 miles of the Washington/Canadian border.

29.      It has recently been announced that Shoppers is being purchased for more than 12 billion dollars by Loblaw Companies, Canada's largest food retailer with more than 1,000 corporate and franchise supermarkets operating under 22 regional and market segment banners.

30.      Because of the large size and geographic reach of Shoppers, the Private Label Contract reached with Shoppers for Therapearl's private label line of business would have resulted in substantial revenue to Therapearl; would have generated and sustained high levels of United States' product exports to Canada; and would have supported U.S. employment opportunities with Therapearl and its agents and contractors.

31.      Rapid Aid has been a supplier to Shoppers since at least as early as 1996 in connection with the sales of hot and cold therapeutic products.

32.      Rapid Aid learned of Therapearl's contract and other business dealings with Shoppers and viewed Therapearl, Therapearl's game changing products, and Therapearl's agreement with Shoppers as a significant threat to its dominant market share of the hot/cold therapeutic pack market.

33.       In an attempt to protect and/or build its dominance in the hot/cold therapy market, Rapid Aid made an unsuccessful offer to Shoppers to supply "copies" of Therapearl's branded products to Shoppers, in place of Therapearl.

34.      After failing to reach its own agreement with Shoppers, Rapid Aid filed a sham lawsuit ("Lawsuit") against Therapearl knowing, or at least believing and intending, that the existence of the Lawsuit would frustrate or terminate Therapearl's contract with Shoppers.

35.     Rapid Aid's Lawsuit makes objectively baseless claims, predicated upon fabricated facts.

36.     Rapid Aid admits in court documents that it does not know the particulars of alleged negotiations between Therapearl and Shoppers. Regardless of this revealing admission, Rapid Aid alleges specific "facts" about what supposedly occurred during such negotiations.

37.     According to Rapid Aid, the "negotiations" which are the alleged predicate for its lawsuit supposedly occurred "as early as November 2011" and pertained to Rapid Aid's offer to Shoppers to supply Shoppers copies of Therapearl's products.

38.     According to Rapid Aid, Therapearl made statements that Rapid Aid's proposed products were infringing or would infringe Therapearl's intellectual property.

39.     However, the alleged negotiations between Therapearl and Shoppers pertaining to Rapid Aid's offer never took place. In fact, Therapearl did not even know of the existence of Rapid Aid's offer to Shoppers at the times alleged by Rapid Aid. Moreover, Rapid Aid had not yet commercialized any product which was similar to Therapearl's products. Therefore, Therapearl could not have engaged in the conduct alleged by Rapid Aid.

40.     Rapid Aid fabricated its allegations pertaining to the supposed November 2011 negotiations for the sole purpose of filing the Lawsuit against Therapearl to interfere with, damage, or terminate the Private Label Contract between Therapearl and Shoppers.

41.     In addition to fabricating facts to support its Lawsuit, Rapid Aid has asserted a claim in its Lawsuit that Therapearl is liable to Rapid Aid for violations of a criminal statute. However, Rapid Aid knows that because Rapid Aid is a private, non-governmental entity, Rapid Aid has no legal authority or "standing" to sue Therapearl for violations of a criminal statute.

COMPLAINT                                    8

42.     Rapid Aid has asserted alleged violations of a criminal statute against Therapearl in its Lawsuit for the sole purpose of interfering with, damaging, or terminating the Private Label Contract between Therapearl and Shoppers.

43.     In addition to its other objectively baseless legal claims, Rapid Aid – in its Lawsuit – has requested that a Canadian court issue an injunction to enjoin Therapearl from marking, representing, or advertising that its hot/cold therapy product(s) is/are covered by a pending patent application. Rapid Aid has inconsistently requested this injunction while otherwise knowing, and admitting that it knows, that Therapearl has a patent pending in the United States, in addition to many other issued and pending intellectual property rights in the United States and around the world.

44.     The injunction requested by Rapid Aid has been solicited with no territorial or country specific boundaries and has and will continue to detrimentally impact Therapearl in its ability to maintain and make intellectual property related markings and representations, within and affecting the United States.

45.     The injunction requested by Rapid Aid has been solicited from the Canadian court despite the fact that Rapid Aid engages in the very same marking practices that Rapid Aid alleges are unlawful when practiced by Therapearl. For example, Rapid Aid – a Canadian company with a large Canadian customer base - was advertising its Insta-Gel$^{TM}$ containing products as "patented" (with no geographic indicator or country specificity) on or around November 2008, after the issuance of its corresponding U.S. patent, but before the issuance of its Canadian patent. (Exhibit 2)

46.     Rapid Aid knows that Therapearl's marking and advertising practices, which mirror Rapid Aid's own practices, are lawful but has requested an injunction against Therapearl in its

Lawsuit for the sole purpose of interfering with, damaging, or terminating the Private Label Contract between Therapearl.

47.     In addition to other harms, the injunction requested by Rapid Aid has and is preventing Therapearl from knowing the lawfulness of its "patent marking" on its virtual marking page – authorized by a United States statute, 35 U.S.C. § 287 – which is authored and directed in the United States, hosted by a United States' domain company on servers based in the United States, and is published (i.e., accessible on the world wide web) for viewers in the United States, as well as worldwide.

48.     As a result of the requested injunction, the rights of Therapearl to directly mark its packaging and products with patent related markings, and the rights of Therapearl to otherwise make representations related to its patent protections, have also been jeopardized.

49.     As a direct and predictable result of the Lawsuit, Shoppers suspended the Private Label Contract with Therapearl thereby damaging Therapearl within and affecting United States commerce.

50.     In addition to filing its sham Lawsuit with the intent of damaging Therapearl, Rapid Aid has used its unique position as the market leader in hot/cold therapy products, as well as its continuing role as an existing supplier to Shoppers, to gain access to key Shoppers' employees to spread false information about the content, scope, and validity of Therapearl's intellectual property. Rapid Aid has also made objectively false statements about the performance of Therapearl's products.

51.     For example, on or around October 2011, Jeff Whitely, President of Rapid Aid, authored and sent an email to Shoppers, commenting on Therapearl's products, stating, "…the

product does not get warm enough to provide proper warm therapy." Such statement was false and meant to damage the reputation of Therapearl.

52.     As a result of Rapid Aid's objectively baseless Lawsuit, Therapearl has been denied access to a large sector of the hot/cold therapeutic pack market.

53.     As a result of the Rapid Aid's objectively baseless Lawsuit, Rapid Aid is furthering its goal of maintaining its market power and market share of the worldwide hot/cold therapeutic pack market.

54.     Therapearl has been damaged and continues to incur damages as a direct and proximate result of the filing of the Lawsuit.

55.     As a result of the injunctions sought by Rapid Aid, Therapearl's legal rights have been drawn into question pertaining to its intellectual property marking and patent related publicity and/or advertising practices within the United States.

56.     Rapid Aid's unlawful conduct has resulted in harm to Therapearl's United States exports, loss of profit and revenue due to Therapearl, loss of substantial tax revenue to the United States treasury, and loss of employment at Therapearl within the United States.

## COUNT ONE
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201, *ET SEQ*. (DECLARATORY JUDGMENT ACT)

57.      Therapearl repeats, realleges, and incorporates by reference each and every paragraph above as if set forth fully herein.

58.     There is a real and actual controversy regarding Therapearl's rights to use the words "patent pending", and rights to otherwise represent that a patent is pending, pertaining to its hot/cold therapy products. Such real and actual controversy exists as a result of Rapid Aid's Lawsuit, whereby

Rapid Aid is seeking to enjoin Therapearl with respect to its intellectual property marking and patent related publicity and/or advertising practices.

59.     Rapid Aid's request for an injunction contains no geographic or territorial restrictions. Therefore, if granted, the scope of the requested injunction would affect Therapearl's conduct and rights in the United States, including with respect to Therapearl's virtual marking webpage(s) which are visible both in the United States and Canada.

60.     Rapid Aid's conduct has forced Therapearl to choose between risking legal liability and "silence" with respect to patent marking or making representations related to its lawfully applied for intellectual property.

61.     The controversy between Therapearl and Rapid Aid is thus real and substantial and demands specific relief through a decree of conclusive character.

62.     Therapearl is entitled to a declaratory judgment that it may lawfully use patent related markings on its webpages, packaging, and products, and otherwise make accurate patent or intellectual property related representations relating to its products.


### COUNT TWO
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT

63.     Therapearl repeats, realleges, and incorporates by reference each and every paragraph above as if set forth fully herein.

64.     Rapid Aid has knowingly and willfully engaged in a course of conduct designed to improperly obtain and/or maintain monopoly power in the hot and cold therapeutic product market, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. This course of conduct includes,

*inter alia*, a) the filing of objectively baseless litigation against Therapearl, which had no legitimate business purpose, and which was filed solely to damage the Private Label Contract between Therapearl and Shoppers; b) making false or misleading representations to Shoppers about Therapearl's intellectual property rights; and/or c) making knowingly false representations about the performance of Therapearl's products.

65.    Rapid Aid's unlawful conduct has harmed Therapearl's United States exports and sales and has eliminated and/or stifled competition in the relevant market. Rapid Aid's lawsuit filed against Therapearl is objectively baseless, as no reasonable litigant could have a realistic expectation of success on the merits of a claim when they know that their predicate allegations are fabricated and/or self-contradictory.

66.    Rapid Aid's Lawsuit was filed in bad faith, motivated by the desire to interfere with the Private Label Contract in order to obtain and/or maintain monopoly power and restrain competition in the relevant market. Rapid Aid knew, or at least expected and intended, that the Lawsuit would stifle competition and cause damage to Therapearl and thereby eliminate competition in the relevant market.

67.    The retail sale of hot/cold packs is a relevant line of commerce and/or market within the meaning of the antitrust laws.

68.    The relevant market consists of, but is not limited to, hot/cold therapy packs.

69.    The relevant geographic market is in the United States and Canada.

70.    By its own admission, Rapid Aid is "the number one manufacturer of hot/cold therapy products worldwide" and "the largest private label manufacturer of hot/cold therapy products."

71.     Rapid Aid has engaged in conduct with anticompetitive effects, in order to unlawfully obtain and/or maintain a monopoly in the relevant market, stifle competition and eliminate or reduce consumer choice through exclusionary behavior designed to exclude Therapearl from the relevant market.

72.     Rapid Aid intends to monopolize and/or maintain its monopoly on the relevant market.

73.     Rapid Aid's conduct, if unchecked, presents a realistic and great probability of monopolizing and/or maintaining a monopoly and/or causing injury to the relevant market.

74.     Rapid Aid possesses the ability and actually has, through the filing of its sham litigation, greatly reduced or eliminated competition in the relevant market.

75.     There is a realistic and great probability that Rapid Aid's filing of an objectively baseless lawsuit and request for injunctive relief, if successful and unchecked, would allow Rapid Aid, through its capacity to achieve and maintain market power, to achieve and/or maintain a monopolistic share of the relevant market.

76.     Therapearl has been injured in its business by reason of Rapid Aid's antitrust violation alleged in this count. Therapearl's injuries include attorneys' fees and litigation related expenses required to defend against Rapid Aid's lawsuit.

77.     As a result of loss of economies of scale and other losses or damage caused by Rapid Aid's actions, prices for goods in the relevant market have been affected such that United States consumers have suffered competitive injury.

78.     As a direct and proximate result of Rapid Aid's anticompetitive conduct as alleged herein, Therapearl has been damaged in an amount to be proven at trial, trebled pursuant to 15 U.S.C. § 15(a). The injury is direct and substantial, and includes, but is not limited to, loss of sales and

profits, attorney's fees defending Rapid Aid's objectively baseless claim, the loss of an acquisition or merger contract, pre-judgment interest, impaired ability to attract investment or investors, impaired ability for growth, loss of economies of scale, loss of market share, reduction in the value of its business, loss of business reputation, and costs.

## COUNT THREE
### TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR BUSINESS RELATIONSHIPS

79.     Therapearl repeats, realleges, and incorporates by reference each and every paragraph above as if set forth fully herein.

80.     Negotiations between Therapearl and Shoppers resulted in the formation of the Private Label Contract, wherein Shoppers was going to purchase Therapearl packs from Therapearl and offer such packs for sale to Shoppers' customers under a different brand name.

81.     For no other reason than to harm the contract between Therapearl and Shoppers, Rapid Aid filed an objectively baseless, sham lawsuit in which it fabricated factual allegations against Therapearl.

82.     At the time it filed its Lawsuit, Rapid Aid knew that Therapearl had formed a contract with Shoppers to provide Shoppers with hot and cold packs which would compete with Rapid Aid's products. Rapid Aid's knowledge of the contract is evidenced by its own admission in its Lawsuit.

83.     For the purpose of further frustrating or discouraging any performance under the contract, Rapid Aid made false or misleading representations to Shoppers regarding the scope, content, and validity of Therapearl's intellectual property rights and made false statements pertaining to the performance of Therapearl's products.

84.     As a direct and proximate result of Rapid Aid's unlawful acts, Shoppers has suspended the Private Label Contract with Therapearl.

85.     As a direct and proximate result of Rapid Aid's objectively baseless lawsuit, Therapearl has accrued and continues to accrue damages.

## COUNT FOUR
### MARYLAND COMMON LAW UNFAIR COMPETITION

86.     Therapearl repeats, realleges, and incorporates by reference each and every paragraph above as if set forth fully herein.

87.     As alleged herein, Rapid Aid has damaged or jeopardized Therapearl's business by actions amounting to unfair methods.

88.     As a result of Rapid Aid's filing of the Lawsuit, and as a result of the false or misleading representations made by Rapid Aid, members of the public are likely to be deceived about the reputation and honesty of Therapearl including but not limited with respect to Therapearl's representations regarding its intellectual property rights, thereby damaging Therapearl.

89.     As a result of Rapid Aid's acts and practices of disseminating false statements regarding the performance of Therapearl products, representatives of Shoppers and members of the public are likely to be deceived about the quality of Therapearl's products, damaging Therapearl.

90.     Rapid Aid, for no legitimate business purpose, filed an objectively baseless, sham lawsuit in which it fabricated factual allegations against Therapearl. Rapid Aid recognized Therapearl as a competitor in the relevant market, and Rapid Aid filed such a lawsuit for the sole purpose of harming the contract between Shoppers and Therapearl.

91.     Due to Rapid Aid's Unfair Competition, Therapearl is entitled to compensatory and punitive damages from Rapid Aid due to its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Therapearl requests this Court to:

A.     Issue a Declaration that Therapearl may lawfully continue to mark, represent, or advertise its hot/cold therapy products  as "patent pending" or as protected by pending patent rights;

B.     Enter judgment against Rapid Aid and in favor of Therapearl for the violations alleged in this Complaint;

C.     Award Therapearl general damages in an amount to be established at trial to the within action;

D.     Award Therapearl compensatory damages in an amount to be established at trial to the within action;

E.     Treble the damages awarded to Therapearl pursuant to 15 U.S.C. § 15(a) in an amount to be established at trial to the within action, as a result of Rapid Aid's violation of the Sherman Antitrust Act;

F.     Award Therapearl for costs of suit incurred herein, including its reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and

G.     Award to Therapearl such other and further relief as the Court may deem just and proper.

Plaintiff THERAPEARL hereby DEMANDS A JURY TRIAL.

RESPECTFULLY SUBMITTED,

Dated: September 23, 2013                    /s/Matthew A. Pequignot

Matthew A. Pequignot, Bar No. 16062
Pequignot + Myers
90 North Coast Highway 101
Suite 315
Encinitas, CA  92024
Phone:  202-328-1200
Facsimile:  202-328-2219
mpequignot@pmiplaw.com

Attorney for Plaintiff Therapearl, LLC